We have five cases on for argument today. For the benefit of all counsel, let me advise you about the lighting system. When the yellow light goes on, your rebuttal time has begun. And when the red light goes on, your entire time has expired. Very well, we'll hear the argument first in number 2008-5190, Stobie Creek Investments v. United States. Good morning, your honors. May it please the court. I would like to focus on two issues today, penalties and the economic substance test under the Coltec case. In addition, the court issued a letter to us with respect to the Marriott decision that came out last week. I'd be pleased to entertain any questions the court has with respect to comparisons of Marriott and Stobie Creek. With respect to penalties, Stobie Creek met the requirements, the standards of the reasonable cause defense of the regulations under section 6664. And it was error to impose penalties on Stobie Creek. This is in reality a case where a penalty has been imposed on a taxpayer that reasonably relied on its counsel some 40 years in duration. One that the entire family had a continuing, ongoing relationship with. The regulations in the cases tell us that the reasonable cause defense under section 6664 is a facts and circumstances test. The trial court in Stobie, however, effectively applied a de facto per se test in imposing penalties. Now, let me have you clarify for me, if you would, the exact position that, I guess it's SLK, is that the? Shoemaker, Lupin, Kendrick, that's the acronym, SLK. Mr. Waterman took on this. My understanding was that they ultimately declined to give an opinion as to the validity of this program. Now, you say they were reasonable in relying on SLK and Waterman. Given the failure to take a position, why does that constitute reasonable reliance? The Shoemaker, Lupin, Kendrick firm, David Waterman, did not, it's true, did not provide a written opinion letter. However, Shoemaker, Lupin, Kendrick had acted as counsel for the taxpayers for some 40 years. David Waterman was a trusted advisor. David Waterman sat on the board of directors of ThermaTru. When ThermaTru was, when their thoughts of selling ThermaTru, the Fittwells family had conversations with David Waterman with respect to whether or not there were any methods by which they might be able to affect tax savings. David Waterman ultimately put the taxpayers into touch, into contact with Jenkins and Gilchrist. David Waterman and the Shoemaker, Lupin, Kendrick firm ultimately worked with the Jenkins and Gilchrist firm in providing information and providing background data with respect to not only the family but with respect to potential transactions. Yes, they did not provide an opinion and the reason that they did not provide an opinion was because they thought that the, rightfully, that the amount of the fee that they would be receiving could cause their opinion to be compromised, at least in the mind of the taxpayer. However, when they brought this matter to the attention of the Wells family, the Wells family continued to work with them and continued to look to the Shoemaker, Lupin, Kendrick family, excuse me, to look to Shoemaker, Lupin, Kendrick for continuing advice. The fact that David Waterman didn't let this transaction rest and that when notice 2000-44 was actually issued, David Waterman is the one who requested that his firm vet 2044 and whether or not 2044 had actual effect and impact on the transaction. Judge Miller's opinion talks in terms of the so-called BS memo. This is the memo that David Waterman requested Tom Cotter and John Iveson to prepare. This is the memo that vetted 2000-44. Yes, David Waterman put margin notations the same way that most conservative lawyers, most lawyers who are concerned about their clients will take a look at the facts, analyze them to try and make sure that there are no misstatements. But just to be clear, was that opinion, was that draft opinion given to the client, Mr. Wells? No, Mr. Wells. I guess I'm not clear on precisely what you're relying on in terms of what SLK did that would give the taxpayer a reasonable cause. Well, going back to the Vero Beach meeting back in January 2000, David Waterman is the one who proposed or who described the particular proposed transactions to the Wells family at the Vero Beach meeting. When he was asked by members of the Wells family what he thought of the transaction and specifically whether or not he would do the transaction, David Waterman stated quite clearly that if he were similarly situated, he had sufficient confidence in the transaction that it would work for federal income tax purposes and that if he were in the same position, he would do the transaction. But it seems to me that's, well, not contradicted, but that's obviated by the fact that as he recognized, as he started to answer Judge Bryce's question, he himself told the client that he had a conflict of interest, that he couldn't give an opinion. So I guess I'm not clear on- It's true that he told them that he might have a conflict of interest. He offered, what David Waterman did, however, is he offered to forego any amount of fees that might be received with respect to the transaction. And the Wells family said, no, that's okay. You've had a long history with us. We trust you. We will continue to work with you. Actually, I thought the facts were a little different in that regard. I thought he offered to give up his fees as long as J&G would not take that amount. But given their refusal, he did not give up his fees. But the facts indicate that J&G wound up agreeing to receive its fee in January of 2000, and it was agreed at that time that it would be a $4 million fee. There was no payment that went from Jenkins and Gilchrist to Shoemaker, Loop, and Kendrick. The $2 million payment came from the Wells family as opposed to coming from Jenkins and Gilchrist. Can I just move you on off a little to what you're asking? It seems to me that you're arguing that under the economic substance doctrine, we should focus exclusively on the FX dot, is that what you call it, F-C-O-T transaction. This is the Coltec analysis? Yes. I think that the analysis in Coltec should not, if you're going to apply a Coltec analysis, it should not be focused solely on the FX transactions. It actually should be focused on the transaction which gave rise to tax benefits. Which is the whole J&G strategy? Well, the transaction that gave rise to the tax benefits is not the entire J&G strategy. The transaction that gave rise to the tax benefits was the formation of Stobie Creek. Stobie Creek was formed by a contribution of the FX options along with the contribution of the ThermaTru stock. That was the actual transaction which gives rise to the tax benefits. That would be the parallel to the Coltec case. In Coltec, the parallel, the transaction that gave rise to the tax benefits was the transfer of the assets, the $375,000 in notes, plus the asbestos liabilities into the subsidiary. That's what the court indicated in Coltec. That was the same transaction that was involved in the Jade case. There's a major difference between both Coltec and Jade, and Stobie Creek from that standpoint, in that both in Coltec and in Jade, the transfer of the options into or the assets into the subsidiary in Coltec and into the partnership in Jade were transitory transfers. Actually, the entities were transitory entities, designed solely for the purpose of creating a loss. By contrast, Stobie Creek is a transaction in which the Wells family was looking to establish a family investment vehicle as well as a family office. It was in conjunction with the creation of the family office, North Channel, and the creation of the family investment vehicle that the assets were transferred. The FX options as well as the ThermaTrue stock was transferred into Stobie Creek. That would be the transaction that would give rise to the tax benefits. Everybody has recognized that the transfer of the assets into Stobie Creek had valid business purpose. Stobie Creek still exists today. Stobie Creek still functions today. Counsel, before you start getting into your rebuttal time, can I ask you to focus on the Marriott case that the court brought to your attention? I realize it was only on Friday. Sorry, but the opinion only issued on, I think, Thursday. Certainly. We got it as quickly as we could to your attention. With respect to Marriott, it's our view that Marriott does not have an effect on the Stobie Creek case. Do you agree that Judge Miller found that under the Helmer Doctrine and 752 that she could not find that the contingent obligations constituted a liability for purposes of 752, and that's why she went to the economic substance doctrine? Because the precedent didn't exist to suggest that the contingent obligations constituted a liability. I'm reading in particular directly from her opinion, so I'm hoping that you'll agree that she actually made that conclusion. I look at Marriott. Let me see if I can explain my view on Marriott. Before you explain your view on Marriott, I want to understand what the judge, Christine Miller, did in this case. Sure. In particular, I think she focused on whether or not IRS revenue rulings and Section IRC 752 demonstrate that contingent obligations do not constitute liabilities for purposes of 752. She seemed to conclude, it seems to me, that 752 and Helmer were inconclusive or that it hadn't been established by precedent whether or not contingent obligations were liabilities under 752. So she gave you the benefit of the doubt by saying, we'll treat them as though we're not and we'll decide this case on economic substance. But, of course, if they are, then it seems like this is an open and shut case. Well, the history of Helmer is that short positions generally establish contingent liabilities and, therefore, are not to be taken into account in conjunction with determination of basis. My reading of the various revenue rulings, 88, 77, and 95. This was your position at the lower court, certainly. But given the Marriott opinion, which just issued from our court, saying, yes, they do constitute those contingent obligations, yes, they are to be considered for determining partnership basis under 752, how is that not the end of the case for you? The court in Marriott on page 20 of that decision said that they were not issuing any type of broad rationale for any short sale of borrowed securities, ranging from traded speculative common stock to a short-term Treasury bill, generates an obligation to return. It says, rather, where Treasury bills or notes are involved, the risks in closing the short transactions are relatively circumscribed and the resulting liability should be recognized for basis adjustment purposes. Now, in a short sale transaction of Treasury notes, there is a definite obligation that is established that the borrowed securities must be returned. Reg T establishes the necessity of having collateral. That's not the case with options such as were used in the Stobie Creek case. What was used in the Stobie Creek case are called digital options on foreign currencies. Those are transactions that are conducted on an over-the-counter market. There is no liability on those options unless they expire in the money at some future point in time, which is an entirely different situation than persisted in the Marriott case. So I think that there is a base distinction between the underlying obligation. Moreover, I think that I don't want to be repetitive. It says on page 20, other unusual circumstances may exist where basis adjustments may not be appropriate, notwithstanding the symmetrical considerations and underpinned basis adjustments, generally under sections 705, 722, and 752. That's on page 20 of the Marriott decision. So what makes you think this qualifies as one of the other unusual situations? The transactions that were done do not have the same liability structure as would a short-sale transaction. A short-sale transaction of stocks and or bonds would preclude or would necessitate the establishment of some type of a collateral to be present. I'm almost out of my time over here. We'll restore you some additional rebuttal time since you've been questioned extensively. And we'll hear next from the government. Ms. Hagley. Good morning. May it please the Court. I'll quickly respond to the one point that counsel made on the economic substance doctrine. The formation of Stobie Creek is not what gave Rice the tax benefits in this case. It was the various steps of the Jenkins and Gilchrist strategy of investing in the options, having the LLCs invest in the options and then the same day transfer to the partnership and then shortly thereafter have the LLCs transfer their partnership interest to the S corporations, which triggered the Section 754 election that inflated the basis in the ThermaTrue stock. The fact that Stobie Creek may have had a legitimate business purpose of being an investment structure for the Wells family has absolutely no bearing on whether this particular tax strategy had any economic substance. And as the Court of Federal Claims found, the taxpayers were seeking a prepackaged tax scheme to shelter the $200 million expected gain. And, you know, the amount of the options were selected for tax purposes, not for any investment purpose. And, you know, as we explained in our brief, the strategy lacked any real profit potential. Of course, any questions on that I'd be happy to answer. Otherwise, I'll move on to penalties. With regard to penalties, Stobie Creek has failed to demonstrate that the reasonable cause determination was clearly erroneous. In fact, they have no response in their reply brief to any of the points that we made in our brief. But accuracy-related penalties are mandatory unless taxpayers can prove the heavy burden that they fit within the reasonable cause exception. This is essential to our self-assessing tax system because these penalties provide a downside for those playing the audit lottery. And they assure law-abiding taxpayers that the IRS is going to penalize those who aren't paying their fair share, since you're not a chump for paying your taxes. The court did look at all the facts and circumstances here and determined that there was no reasonable cause. The court determined that Stobie Creek could not reasonably rely on either Jenkins & Gilchrist or Shoemaker because both were tainted by a conflict of interest. You know, key to this was the fact that the fees were based on the purported tax benefit. There was also a confidentiality agreement they had to enter to, showing that the advisors had a vested interest in the validity of this tax shelter. The Jenkins & Gilchrist opinion that Stobie Creek relies on, the court found didn't satisfy the minimum regulatory requirements set out in the 66-64 regulation, which provides that the opinion cannot be based on false factual representations or assumptions. And the court found here that this opinion contains several false factual representations or assumptions that precluded any reliance on it. Going back, just reaching back now to the economic substance doctrine, could you explain to me briefly how the step transaction doctrine and the economic substance doctrine differ? How they differ? Certainly. Because it seems to me that the step transaction doctrine is just a part of the economic substance doctrine, at least when you're talking about applying the economic substance doctrine. Actually, there are two distinct doctrines, and we cite a case in our brief from the Third Circuit Neonatology, which explains the distinction. I think it's in footnote 12, and that same footnote cites a Tenth Circuit decision, Rogers, that does a really good job of explaining the distinction. But let me try and do it briefly for you. The economic substance doctrine is going to disregard, for tax purposes, just completely disregard a transaction that lacks economic reality. Looking at the transaction being here, you would say the whole J&G strategy. The whole J&G strategy, exactly. For example, there's no business reason for doing it that there's no profit potential. The step transaction doctrine, in contrast, is a subset of what's referred to as the substance over form doctrine, which says that, okay, a transaction may have economic reality, may have an expectation of making a profit, but what is the transaction really? That the substance of it, not the forms, are going to govern it. So under substance over the form, the IRS is entitled to disregard meaningless labels on a transaction, meaningless steps to determine what is in substance going on here, because that's what the tax code applies to, the substance, not the form. So, for example, you and I can have a contract between us, and it's a real business, and this is a real deal, and we're calling it a lease. But that doesn't mean that I'm going to be entitled to tax deductions based on a lease. If the IRS looks at it and goes, well, looking at the realities, this isn't really a lease. It's really a sale, or it's really a loan. And so I think that's the distinction. And Falconwood fails under that, or survives under that test, right? Well, the court in Falconwood found, I mean, there was a real business deal going on in Falconwood, I believe it was a merger of some sort, and the court found that the steps, so the economic substance doctrine was not applicable in Falcon. It was a step transaction issue there, and what this court found is that the steps that the IRS determined to be meaningless and had attempted to disregard, in fact, were dictated by the IRS's own regulations. So there was a regulatory purpose for the taxpayer in that case to engage in the specific steps there. So the court found that the tax benefits survive the step transaction doctrine. And here, to apply that here, the steps that are meaningless, that you would take the position are meaningless, are the what, the transfer of the partner's step to the S Corporation? Exactly, and as well as the transfer of the LLC, of the partnership interest from the LLC to the S Corporation. In the reply brief, the taxpayer tried to argue, well, there's more protection with an S Corporation than an LLC, so there was a business reason for it, but the LLCs and the S Corporations were created the same day. So if the S Corporation was really that much of a better vehicle, they should have begun with the S Corporation. The only reason was to trigger their Section 754 election and the tax benefits. Let me respond briefly to the court's question we received on Friday with regard to Marriott. In our view, Marriott doesn't affect this case because it addressed a statutory argument that we didn't make here. The case was decided on summary judgment, so in Marriott, the court didn't have the opportunity to determine whether the shelter in that case had economic substance or not. In this case, we've had a full trial. The court's listened to all the witnesses, looked at all the facts, determined that the transaction, in fact, lacks economic substance, as well as fails the step transaction. As the court in Koltek made clear, if a transaction lacks economic substance, whether it complies with the literal language of the code or not is irrelevant. Yes, but counsel, if it doesn't comply with the literal language of the code, then isn't it an open and shut case? Why would we reach the mushy doctrine of economic substance if the statutory language has otherwise been clearly interpreted to cover the situation? I think that may be true in some cases, but given the procedural posture of this case, where the corporal found that it complied with the code, it failed economic substance. Do you think the court found that it complied with the code, or did the court acknowledge that there wasn't a clear precedent on the coverage of 752 vis-à-vis short sales like this? It may have been the latter, but went on to be a precedent. But now there is a clear precedent, though. I'm sorry? Now there is a clear precedent. Marriott, you would argue, I assume, if you were starting on day one that Marriott applied to this case, wouldn't you? We may. I mean, to answer that question, we would need further briefing and consulting with the IRS. I know that we've argued in other offsetting options cases that the short option is, in fact, a Section 752 liability. We made that argument in McGuire's partner case. I think it's Central District of California. It's now up on appeal. But here, I mean, the court addressed the economic substance doctrine. That's what we have before this court is whether there's any error. There's not. And I would point out that some of the economic substance analysis the court made does bleed over into the court's penalty analysis, specifically when it was analyzing whether the J&G opinions statements were true or not. A lot of that turned on whether the original expectation of profit, whether there's any business purpose for the various transfers. But those are issues that could be separately addressed under the penalty area. But that doesn't necessarily necessitate reaching economic substance when you've got statutory language that clearly applies. That's true. That's correct. Why, could you discuss briefly the exclusion of the Smith testimony? Sure. And in particular, the extent to which you think that Smith is irrelevant, even if the trial court relied on the flawed nature of the J&G opinion? Well, our view is that the court held that the law in the J&G opinion was fine and why the J&G opinion could not reasonably be relied on is because of the factual representations being incorrect. That's exactly where I wanted to go. Is it the factual representations that were made by Mr. Wells, in effect, predicated on statements in the J&G opinion saying, of course this only applies if there's a bona fide business purpose, or is it factual representations in the J&G letter itself that are problematical or both? I think it's both. I mean, the J&G opinion letter itself, and Debbie Peek has warned many times about this, says our opinion is predicated on these particular facts and these are not true. Exactly, but that's not a factual representation by J&G as to those facts. Oh, it's from the taxpayer. But that's what I wanted to make sure I understood, that your position. Is your position that the factual representations you refer to are factual representations, in effect, made by Mr. Wells, or factual representations by J&G that were incorporated into the letter? It's actually both. Okay, now tell me about the latter category, the ones that were J&G's factual representations, not representations in which they were relying on Mr. Wells. Well, the one that the court identified was that there had been an objective investment analysis. That was not in the representation section of the opinion. That was in the opinion's analysis. And as it ended up, there was, in fact, no objective investment analysis. And what the court found is that Wells should have known that that was a false assumption in the opinion. And there was nothing that, I mean, Smith, when he opined, when the expert opined that this type of opinion could reasonably rely on, said that he assumed that all the representations were assumptions. But that was not something that was created. The objective investment analysis was not something that was generated, I take it, by J&G. That was by a third party, right? Well, it didn't exist at all. I mean, no one's ever identified this objective investment analysis. It was just something everybody assumed existed because it was in the letter. But as the court found, if, in fact, there had been an objective investment analysis, it would have been something along the lines of what Dr. DeRose, the government's expert, had come up with, and it would have concluded, to the contrary, that you couldn't make a profit on this strategy. Can I ask one more question? Of course. I understand the government's position on economic substance and step transaction to be, if you agree with the trial court's decision on either of these, we win. Is that correct? We don't have to agree necessarily with both of them, but if we agreed with either one, you would prevail. That's correct, and it's in the alternative. And with regard to the step transaction, our primary argument was that any challenge to it was waived. We haven't actually briefed the step transaction. This appeal, we just pointed out that in their opening brief, they didn't challenge it. They waived it. If the court has any question about waiver, it can certainly just affirm the economic substance determination the court made. Does the court have any further questions? Thank you. Thank you. Mr. Kolek, we'll give you a couple of extra minutes of rebuttal. Turning to the language that appears on page K23 of the Jenkins and Gilchrist opinion, nobody knows the source of that language other than it was Jenkins and Gilchrist's opinion. There are other segments of the Jenkins and Gilchrist opinion where it's clear that they have had conversations with people at Deutsche Bank dealing with the actual FX options. I can assume that in connection with its discussions with respect to the FX options, that Jenkins and Gilchrist may have gotten advice from Deutsche Bank that there was a profit motive. Deutsche Bank also had a conflict in this case, right? It was getting fees. There would have been a conflict, but I don't believe that either Jeffrey Wells or any of the Wells members of the Wells family would have known about it. There's a lot of information that came out during the trial with respect to the relationship between Jenkins and Gilchrist and Deutsche Bank, that there would have been no way for the Wells family to have known about that information. Is this going to my exchange with Ms. Hagley about the Smith, the pertinence of the Smith evidence? Yes, well, the pertinence of Smith... Smith was not opining, I take it, as to anything having to do with the accuracy of the representation by Deutsche Bank. What Smith was being proffered for was solely that the Jenkins and Gilchrist opinion was reasonable and that it would be reasonable for the Wells family to have relied upon that information. Mr. Smith would have opined with respect to the fact that the Jenkins and Gilchrist opinion met the requirements of ABA 346 and Circular 230, and as a result met the requirements of the regulations under Section 6664. That was the principal purpose, and we believe that it was an abuse of discretion on the part of the court not to allow that testimony in. But if it's true, and it seems to be, that Mr. Smith is accepting arguendo that there is a business purpose to the transaction, doesn't the accuracy of the opinion setting aside that representation, isn't that essentially irrelevant since that representation is first and foremost critical to the economic... In actual fact, there was a business purpose for each and every step... But what I'm focusing on is, in other words, what I'm trying to get at is, does Mr. Smith give you anything that is contrary to what the trial judge said? The trial judge is focusing on the problem that there is no business purpose, as she saw it, to this transaction. Mr. Smith doesn't say anything as to that. He's saying, assuming there is, then this opinion is accurate as far as it goes. What does he give you that is contrary to what the trial judge found? What Mr. Smith gives is the fact that, as a practitioner, he reviewed the opinion. In the mind of someone like the Wells family, that the opinion, the way it was phrased, the way it was postured, it was a reasonable opinion upon which they could rely. Now, with respect to the transfer, for example, of the LLC interest into the S Corporation, tax lawyers abound in trying to structure transactions in a particular sequence. Is there a business purpose for transferring the LLC interest into the S Corporation? As a practicing tax lawyer, I can tell you clearly that there is a definite purpose for transferring a partnership interest, or an LLC interest that's taxed as a partnership, into an S Corporation as part of an estate planning vehicle, because you don't want to have the shares of the LLC transferred as gifts to family members, because every time you do, it causes a horrendous problem under subchapter K with respect to allocations of income. It's a very, very difficult problem to encounter. You could set aside a separate silo S Corporation that is owned by a member of the investment LLC. That member can make contributions of interest in the S Corporation without affecting anybody else that is a member of that partnership. Therefore, it eliminates a lot of intermediate adjustments and income adjustments. Very well. Thank you. Thank you, Mr. Phillips. Exactly. Thank both counsels.